02-09-413 & 414-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00413-CV

NO. 02-09-00414-CV

 

 


 
 
 Elizabeth Ann Davis Crews
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Gary M. Gordon d/b/a Gordon Taylor Custom Homes
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

 

FROM THE 141st
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I.  Introduction

          Appellant
Elizabeth Ann Davis Crews challenges the legal and factual sufficiency of the
evidence to support the jury’s findings in favor of Appellee Gary M. Gordon
d/b/a Gordon Taylor Custom Homes.  We will affirm.

II.  Factual
and Procedural Background

          Gordon
has been a custom and speculative homebuilder for thirty years.[2]
 In June 1999, he contracted with Crews to build her a house.  Crews moved into
the house sometime in early 2000, but there was a “punch list” of “small items
on the house, touch ups, fix ups and so forth” that needed to be completed.  Gordon
claimed that he performed the repairs, sometimes two or three times, spending
about $55,000 in “extras” for which he was never reimbursed, but Crews was
never satisfied with his efforts.[3]  Crews eventually sued
Gordon in September 2000 for, among other things, breach of contract, fraud,
and violations of the DTPA in relation to the construction of her house, and
Gordon asserted a counterclaim against Crews for monies owed to him.[4]

          Crews
and Gordon mediated the lawsuit on July 28, 2003.  That same day, they entered
into a “Compromise and Settlement” agreement (CSA) that contained the following
terms:

1.       [Gordon]
shall pay [Crews] the sum of $33,000.00 at closing.

 

. . . .

 

3.       [Gordon]
shall deliver to [Crews’s] attorney a sworn, true and correct personal
financial statement that shows he is judgment proof on or before 4:00 PM August
4, 2003.  [Crews] has been induced to enter into this agreement to settle a
disputed claim for a lesser amount than she thinks is appropriate based upon
and in reliance upon [Gordon’s] sworn, true and correct, financial statements.

 

4.       [Gordon] and
[Crews] shall enter into a real estate sales contract that provides that
[Gordon] shall purchase [Crews’s] home in question (home) for 91% of its
appraised value . . . .  The closing of the home sale (home
closing) [shall] be within 60 days of written notice by [Crews] . . . . 
The written notice from [Crews] to [Gordon] shall be on or before July 28, 2008 . . . .

 

. . . .

 

[6].     Each party
hereby releases the other party from all claims, known or unknown, for and in
consideration of this Compromise and Settlement, except as provided herein. 
The release includes . . . legal representatives. . . .

 

          [Gordon’s
attorney] shall prepare the . . . forms . . . and such other
documents needed to accomplish this agreement . . . .

 

. . . .

 

          Closing
shall occur on or before 5:00 o’clock p.m. on August 28, 2003 . . . . 
Closing is the event at which executed documents and funds are actually
exchanged to complete this Agreement.  The delivery of all documents, fully
executed by the parties, and the funds to be delivered are to be done on or
before the closing date. . . .

 

THIS AGREEMENT IS NOT
SUBJECT TO REVOCATION [Emphasis added.]

          In
accordance with the CSA, Gordon submitted his first financial statement to
Crews on August 1, 2003, several days before the August 4, 2003 deadline.  The
statement identified Gordon’s net worth as negative $340,050, and he signed the
statement under the following verification:  “I hereby affirm that the above
information is true and correct to the best of my knowledge, information and
belief.”  But Crews “was not happy with” the statement and asked that Gordon
submit a new financial statement, which he agreed to do.[5]

          Gordon
submitted a second financial statement on August 4, 2003, that identified his
net worth as approximately negative $474,000 and included the same declaration found
in the first financial statement above his signature.  Unlike the first
financial statement, the second financial statement included information about
his ownership in several entities and the assets that those entities held in
banks, a breakdown of his credit card debt, a house (704 Montreux) that he sold
the same day of the mediation, two lots that he owned in Austin, and several
additional liabilities.  Although Crews acknowledged that the second financial statement
contained more detail than the first financial statement, she was not satisfied
with the statement; she considered it insufficient; she asked for more
information; and on August 25, 2003, she requested that Gordon submit a
financial statement using a particular form.  Gordon agreed, again.

          Gordon
submitted a third financial statement to Crews on August 29, 2003, using the
form provided by Crews.  The statement contained even more information about
Gordon’s financial condition, identified his net worth as approximately
negative $547,000, and included a verification that the financial information
contained therein was “a true, complete[,] and correct statement of [his]
financial condition.”  But Crews took issue with the statement again and
requested that it be modified to include additional information, including
details regarding Gordon’s community property, assets held in his children’s
names, and tax returns, among other things.  Although Gordon thought that
Crews’s latest request was “changing the rules” because “[n]one of [it] was
discussed in the settlement agreement,” he agreed to submit additional
information to Crews regarding tax returns and credit card statements.

          As
with the three previous financial statements, Crews was yet again dissatisfied
with the additional financial information that Gordon submitted, and she
requested that he provide “the completed financial statement, including all
community property.”  But this time, Gordon refused to provide any additional
information.  Crews consequently filed a “Motion to Enforce Mediation
Settlement,” which the trial court granted, ordering Gordon to turn over
information about his ownership interests in separate and community property.[6]

          On
February 24, 2004, Gordon submitted supplemental financial information to Crews
in accordance with the trial court’s order.  The documents showed that Gordon
had a net worth of approximately negative $597,000.  Crews did not request any
additional financial information thereafter, and the parties worked to finalize
formal settlement documents.  Gordon’s insurance company sent a settlement
check payable to Crews in September 2003 for $33,000 and a replacement check
for the same amount in June 2004.  After Gordon objected to several parts of
Crews’s version of the proposed final settlement agreement, Crews withdrew her
consent to the CSA.

          In
August 2005, Gordon filed his original counterclaim against Crews for breach of
the CSA, alleging that he had fully performed under the enforceable CSA but
that Crews had refused to execute formal settlement documents and to release him
from liability.  The trial court severed all claims related to the CSA from
Crews’s suit against Gordon (cause 141-184797-00) and abated Crews’s suit.[7]

          A
jury trial commenced in June 2009 on the CSA-related claims.  The jury found
that the CSA was a legally enforceable agreement between Crews and Gordon, that
Gordon did not fail to comply with the CSA, that Crews did fail to comply with
the CSA, and that Crews was not fraudulently induced by Gordon to enter into
the CSA.  The trial court signed an amended final judgment ordering that Gordon
“is entitled to a judgment on his breach of settlement agreement claim seeking
enforcement of July 28, 2003 [CSA].”  In light of the judgment in the
CSA-related suit, the trial court granted Gordon’s subsequent motion for
summary judgment on Crews’s abated claims in cause 141-184797-00, regarding the
construction of her house, ordering that “all claims and causes of action
between the parties are dismissed with prejudice and that [Crews] take nothing
by way of her causes of action herein.”  Crews appeals.

III.  Standards
of Review

          We
may sustain a legal sufficiency challenge only when (1) the record
discloses a complete absence of evidence of a vital fact; (2) the court is
barred by rules of law or of evidence from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital
fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v.
Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S.
1040 (1999); Robert W. Calvert, "No Evidence" and
"Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361,
362–63 (1960).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and disregard evidence contrary to the
finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).  Anything more than a scintilla of
evidence is legally sufficient to support the finding.  Cont’l Coffee Prods.
Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996).  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int’l, Inc. v.
Nat’l Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).  If a party is
attacking the legal sufficiency of an adverse finding on an issue on which the
party had the burden of proof, she must demonstrate that the evidence
establishes, as a matter of law, all vital facts in support of the issue.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).

          When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the credible
evidence supporting the finding is so weak, or so contrary to the overwhelming
weight of all the evidence, that the answer should be set aside and a new trial
ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op.
on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).

IV.  Gordon’s Compliance With the CSA

          In
her first and second issues, Crews argues that the evidence is legally and
factually insufficient to support the jury’s finding that Gordon complied with
the CSA.[8]  Crews contends that
instead of submitting a sworn, true, and correct financial statement as required
by the CSA, Gordon “flat out lied to [her] throughout the whole process of
providing her with his sworn, true[,] and correct financial statements” because
the first financial statement did not contain any information regarding 704
Montreux and the two lots that Gordon owned in Austin, the statements failed to
list additional debts and assets, and Gordon admitted to lying in applications
that he submitted to Affiliated Bank.

          At
the heart of Crews’s first and second issues is a dispute about what is
material and what is not material to Gordon’s compliance with the CSA.  Jury
question number 2 specifically addressed materiality, stating in relevant part
the following:

          [Gordon’s]
failure to comply, if any, must be material.  The circumstances to consider
in determining whether a failure to comply is material include:

 

(a)     the extent to
which [Crews] will be deprived of the benefit which she reasonabl[y] expected;

 

(b)     the extent to
which [Crews] can be adequately compensated for the part of that benefit of
which she will be deprived;

 

(c)     the extent to
which [Crews] will suffer forfeiture;

 

(d)     the
likelihood that [Gordon] will cure his failure, taking into account the circumstances
including any reasonable assurances;

 

(e)     the
extent to which the behavior of [Gordon] comports with standards of good faith
and fair dealing.  [Emphasis added.]

See
Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 199
(Tex. 2004) (listing factors of Restatement (Second) of Contracts § 241(a)
(1981) in determining materiality of breach).

          Gordon
testified that one of the “big” issues addressed at the mediation on July 28,
2003, was his financial situation because Crews wanted to know what his “ability
to pay was.”  Crews testified similarly—that Gordon’s financial condition was
one of the “main issues” discussed at the mediation.  In light of the
significance of Gordon’s financial condition, Crews and Gordon included the
provision in the CSA requiring that Gordon submit a sworn, true, and correct
financial statement showing that he was judgment proof and affirming that Crews
was induced to enter into the CSA for a lesser amount than she thought
appropriate based upon Gordon’s financial statements evidencing that he was
judgment proof.  Crews acknowledged at trial that for Gordon to comply with the
CSA, the financial statement that he submitted had to establish that he had a
negative net worth and not a positive net worth.[9]  Gordon testified that he
was “judgment proof” so long as his liabilities exceeded his assets; or as
Crews stated, that he had a negative net worth.  Considering this evidence, the
jury could have concluded—and likely did conclude—that it was material to
Gordon’s compliance with the CSA that he submit a financial statement
evidencing his negative net worth.

          Gordon
testified that the third financial statement, twice supplemented with
additional financial information (ordered once by the trial court), was the
most accurate and detailed of the three financial statements that he submitted
to Crews; that it truly, correctly, and accurately reflected that he had a
negative net worth of $597,000; and, therefore, that he was judgment proof as
of July 28, 2003.[10]  Gordon testified
extensively about the details and figures set forth in the third financial
statement, establishing its accuracy, and the trial court admitted numerous exhibits
supporting Gordon’s uncontroverted testimony that he had a negative net worth
on July 28, 2003.[11]

          Crews’s
arguments highlighting Gordon’s failure to include certain information in his
financial statements impliedly assert that those exclusions were material to
his compliance with the CSA.  The arguments closely track Crews’s testimony
agreeing that “every single thing in the financial statement had to be
absolutely correct for [Gordon] to comply with the settlement, even if the
error made didn’t result in [Gordon] having a positive net worth.” 
[Emphasis added.]  However, Crews was not charged with determining the
materiality of a failure to comply with the CSA; the jury was charged with that
responsibility.  Accounting for the circumstances that the jury was charged
with considering in determining whether a failure to comply was material, the
jury could have determined—and apparently did so determine—that Gordon’s
failure to include information in his first financial statement about 704
Montreux and the two lots in Austin, and his failure to include in the
financial statements more detailed data about assets and liabilities that he
had already identified, were not material to whether he complied with the CSA
because the inclusion of the omitted financial information would not have
resulted in Gordon ever having a positive net worth—an issue that was
material to Gordon’s compliance with the CSA.  Instead, the complained-of omitted
financial information, which was all included in the third, supplemented
financial statement, merely increased the extent of Gordon’s negative
net worth.

          Crews
further argues that the jury could not have found that Gordon complied with the
CSA because he lied to her by excluding information on the financial statements
and because he submitted financial statements to Affiliated Bank that contained
false information.  Attacking Gordon’s credibility, Crews contends that Gordon
“should not be able to come into court, admit that he intentionally left
information out of a series of financial statements[,] . . . and
enjoy the protection of the [j]ury’s verdict in this case.”  Crews’s arguments
disregard the jury’s province in determining witness credibility, erroneously
substituting her opinion of Gordon’s credibility for that of the jury.  See
City of Keller, 168 S.W.3d at 819.  Gordon explained that he did not
include the information about 704 Montreux and the two lots that he owned in
Austin on his first financial statement because “it was a terrible time”; he
was “[t]rying to survive, jocking around money, changing offices, office
managers, reducing the size of the office each time and people.  I had a young child,
you know, a lot of things.”  Regarding the financial statements that he
submitted to the bank, Gordon testified that he excluded debt and inflated
several assets on the financial statements because he needed loans to pay off
debt that he had incurred to banks, subcontractors, lienholders, and suppliers.
 Gordon admitted that what he had done was wrong, but he explained that he had
repaid his creditors and the bank with interest and that the same bank had
loaned him money again.  The jury was free to conclude that Gordon was no less credible—and,
therefore, that he had complied with the CSA by submitting a sworn, true, and
correct financial statement showing that he had a negative net worth on July
28, 2003—notwithstanding his omission of information in the financial
statements that he submitted to Crews and his admitted actions regarding the
unrelated financial statements that he submitted to the bank.

          Crews
also argues that Gordon overstated the amount of his liabilities by $503,500
because he counted certain liabilities twice.  Of the approximately $500,000, Crews
argues that Gordon overstated liabilities in the amount of $471,000 because he
counted liabilities totaling that figure in the financial statements that he
submitted to Crews and in the HUD-1 settlement statement for the “1803 Leeds”
property.  However, Crews raised this issue at trial, and the jury rejected it.
 Gordon testified that he did not sell the 1803 Leeds property until nine
months after he and Crews had entered into the CSA, which was at a point
in time that was irrelevant to his net worth as of July 28, 2003, and that he had
paid additional debts that were attributable to the Leeds property but that
were not listed on the Leeds statement.  Moreover, even if the jury agreed with
Crews’s argument, Gordon still had a negative net worth.

          Viewing
the evidence under the appropriate standards of review, we hold that the
evidence is both legally and factually sufficient to support the jury’s finding
that Gordon complied with the CSA.  See id. at 802, 807, 827; Pool,
715 S.W.2d at 635; Garza, 395 S.W.2d at 823.  Accordingly, we overrule
Crews’s first and second issues.

V.  Crews’s Compliance With the CSA

          In
her third and fourth issues, Crews argues that the evidence is legally and
factually insufficient to support the jury’s finding that she failed to comply
with the CSA.  Crews argues that her obligation under the CSA to release Gordon
from all claims was subject to him submitting to her a sworn, true, and correct
financial statement, which Gordon failed to do, and that she was not obligated
to sign another release for Gordon because the CSA itself operated to
release Gordon and his insurance company.

          We
have already held above that the evidence is legally and factually sufficient
to support the jury’s finding that Gordon complied with the CSA.  Thus, in line
with Crews’s argument, she had an obligation under the CSA to release Gordon “from
all claims, known or unknown,” but she admittedly did not do that.  Crews
testified that in April 2004, she decided that she did not want to go through
with the CSA and that she authorized her attorney “to withdraw [her] consent”
to the CSA.  Indeed, Crews subsequently filed an amended petition in the suit
involving the claims related to the construction of her house instead of
dismissing that suit, and she did not execute the formal settlement documents, even
though the CSA expressly contemplated that she do so.  Crews’s argument that
she was not obligated to sign another release is without any merit because she
unequivocally repudiated the CSA, which also required her and Gordon to
exchange fully executed documents in order to “complete” the CSA.

          Viewing
the evidence under the appropriate standards of review, we hold that the
evidence is both legally and factually sufficient to support the jury’s finding
that Crews failed to comply with the CSA.  See City of Keller, 168
S.W.3d at 802, 807, 827; Pool, 715 S.W.2d at 635; Garza, 395
S.W.2d at 823.  Accordingly, we overrule Crews’s third and fourth issues.

VI.  Fraudulent Inducement

          In
her fifth and sixth issues, Crews argues that the evidence is legally and
factually insufficient to support the jury’s finding that she was not
fraudulently induced by Gordon to enter into the CSA.  Crews contends that the
jury “should have found an intent on the part of [Gordon] to fraudulently
induce [Crews] into entering into” the CSA because (1) Gordon never
performed his obligation to provide her with a true and correct financial
statement but instead filed four financial statements, each containing more
information than the previously submitted statement, and (2) Gordon
submitted a false financial document to obtain a loan from Affiliated Bank.

          Crews
bore the burden of proving her fraudulent inducement affirmative defense.  See
Garner v. Fidelity Bank, N.A., 244 S.W.3d 855, 861 (Tex. App.—Dallas 2008,
no pet.) (stating that party asserting affirmative defense bears the burden of
proving its elements).  We have already held that the evidence is legally and
factually sufficient to support the jury’s finding that Gordon complied with
the CSA by submitting a sworn, true, and correct personal financial statement
to Crews showing he was judgment proof on July 28, 2003, and the jury chose to
accept Gordon’s testimony as credible even though he admitted to filing a false
financial statement with Affiliated Bank.  Crews has not established, as a
matter of law, all vital facts in support of her fraudulent inducement
affirmative defense, nor is the jury’s failure to find that Gordon fraudulently
induced her to enter into the CSA so weak, or so contrary to the overwhelming
weight of all the evidence, that the answer should be set aside and a new trial
ordered.  See Dow Chem. Co., 46 S.W.3d at 242; Pool, 715 S.W.2d at
635; Garza, 395 S.W.2d at 823.  Accordingly, we hold that the evidence
is legally and factually sufficient to support the jury’s finding that Crews
was not fraudulently induced by Gordon to enter into the CSA.  We overrule
Crews’s fifth and sixth issues.

VII.  Appeal
of Summary Judgment in Cause 02-09-00413-CV

          The
trial court granted Gordon’s motion for summary judgment on Crews’s claims
regarding the construction of her house in cause 141-184797-00 (appeal cause
02-09-00413-CV).  Crews concedes that “[i]f Appeal No. 02-09-00414-CV [cause 141-231935-08]
is rejected by the Court of Appeals, Appeal No. 02-09-00413[-CV] is frivolous.”
 She asserts no other arguments.  Because we have overruled each of Crews’s
issues in cause 02-09-00414-CV, we overrule any challenge that Crews makes to
the summary judgment granted in cause 141-184797-00.

VIII.  Conclusion

          Having
overruled each of Crews’s issues, we affirm the trial court’s judgment and its
order.

 

 

BILL MEIER
JUSTICE

 

PANEL: 
DAUPHINOT,
MEIER, and GABRIEL, JJ.

 

DELIVERED:  June 9, 2011









[1]See Tex. R. App. P. 47.4.





[2]Gordon described his business
as “[e]xtremely” financially risky.  He generally builds homes costing at least
$1 million, and when he builds a speculative home, he is responsible for paying
its mortgage and expenses until it sells.





[3]Gordon opined that “[y]ou
couldn’t please [Crews], regardless of what you did.”





[4]This cause was assigned
number 141-184797-00.





[5]The first financial
statement listed the figures associated with several of Gordon’s assets and
liabilities, including “Cash in Bank,” “Homestead,” “Automobiles,” and, among other
things, “Loans Payable to Bank,” but Crews opined that the statement was
incomplete and untrue because none of the information contained therein was
independently verifiable.  For example, Crews was unable to tell from the
statement what bank held Gordon’s cash, what the physical address of Gordon’s
homestead was, what the details were regarding the loans payable to the bank,
and so on.





[6]The trial court ordered
that the information be considered part of the third financial statement.





[7]The trial court assigned
the severed cause 141-231935-08.  Crews pleaded the affirmative defense of
fraudulent inducement.





[8]Crews does not challenge
the jury’s finding that the CSA constituted a legally enforceable agreement
between her and Gordon.





[9]The following exchange
occurred between Crews and her attorney:

Q.      If you got a financial statement from [Gordon]
that showed that he was worth $500,000, positive net worth, that would not have
complied with this agreement, would it?

A.      No.

Q.      The sworn, true, and correct financial
statement had to establish that he had a negative net worth, right?

A.      That’s correct.





[10]Crews agreed that the
appropriate calculation of Gordon’s net worth was as of July 28, 2003, and not
at any time thereafter.  Crews does not argue that Gordon submitted the third
financial statement untimely.





[11]Among other things,
Gordon testified and offered exhibits about balances that he held in bank
accounts at relevant time periods, funds that he withdrew from his retirement
account to pay subcontractors, money that he owed to different institutions,
his homestead, his partial ownership in real property and the debts associated
therewith, his numerous contingent liabilities, tax returns, and past and
pending lawsuits.